

# IN THE
# TENTH COURT OF APPEALS

## No. 10-12-00053-CV

**BASEM JASSIN, M.D.,**

                                                 **Appellant**

 **v.**

**THOMAS O. BENNETT, JR.,**

                                                 **Appellee**

---

### From the 40th District Court
### Ellis County, Texas
### Trial Court No. 81508

---

## MEMORANDUM OPINION

---

In one issue containing three sub-issues, Basem Jassin, M.D., appeals the trial court's order denying his motion to dismiss the health-care liability claim filed against him by Thomas O. Bennett, Jr. We will affirm.

**Background**

Bennett sued Dr. Jassin for negligent post-operative care after Dr. Jassin had performed sinus surgery on Bennett. Bennett served the expert report and curriculum vitae (CV) of Matthew P. Branch, M.D., an otolaryngologist (ear, nose and throat/head

and neck surgeon) who took over Bennett's post-operative care from Dr. Jassin, also an otolaryngologist. Section 74.351 of the Civil Practice and Remedies Code provides that within 120 days of filing suit, a claimant must serve a CV and one or more expert reports regarding every defendant against whom a health-care claim is asserted. TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(a) (West 2011).

Dr. Jassin filed objections to Dr. Branch's report and moved to dismiss Bennett's health-care liability claim. In the hearing on the motion to dismiss, the trial court expressed concern that Dr. Branch had not reviewed certain medical records of Bennett's. The judge commented that although Dr. Branch's report was "a well-outlined, well-defined report," he thought that Dr. Branch had to "have the benefit of those records in order for me to find that he has complied with the statute." The trial court thus granted Bennett a thirty-day extension to "obtain the surgical records and the posttreatment records" and serve a supplemental expert report. After Bennett timely served Dr. Branch's supplemental expert report, which indicated a review of additional medical records, Dr. Jassin filed objections to it and again moved to dismiss Bennett's health-care liability claim. The trial court, noting its prior concern that Dr. Branch had not reviewed all of Bennett's "certain key" medical records, denied Dr. Jassin's motion to dismiss. This interlocutory appeal followed.

According to Dr. Branch's report, Dr. Jassin performed sinus surgery on Bennett on October 16, 2008 and saw Bennett four days later (on October 20) to remove nasal packing. Bennett related to Dr. Branch that the following occurred when he saw Dr. Jassin on this occasion: After a nurse (Susan) removed the packing, Dr. Jassin came into

the room to vacuum his nose. It appeared to Bennett that Dr. Jassin was angry with him and "stormed out of the room" because Bennett had stopped taking prescribed pain medication due to an allergic reaction.

> Dr. Jassin soon came back into the room and vacuumed the left side of my nose for only a couple of seconds. Dr. Jassin then moved to the right side of my nose and vacuumed for a few seconds. Suddenly, without any warning, Dr. Jassin began gouging the lower part of my nose with the hard suction device on the vacuum. The gouging of my nose by Dr. Jassin felt like a knife stabbing me and I cried out in pain as the pain was very intense. I began pulling my head away from Dr. Jassin because of the pain. However, Dr. Jassin instructed Amanda to hold the back of my head toward him and told me not to pull back because "we had to do this." I felt that Dr. Jassin was deliberately gouging my nose because he was pushing the hard vacuum tool into my face with a great deal of force on the inside of my right nostril instead of moving it around to vacuum my nose.

> Dr. Jassin punctured the inside of my nose and it started bleeding profusely. I kept yelling to Dr. Jassin about the pain and asked him why he was hurting me. Dr. Jassin did not answer my question.

> A short while later, while I was still complaining and bleeding, Dr. Jassin asked, "What hurt you? Was it when Susan took the packing out of your nose?" I told Dr. Jassin, "hell no! It was when you punctured the inside of my nose with the vacuum tool."

> At that time, Dr. Jassin just turned and walked out of the room without saying anything further to me.

> While Dr. Jassin was out of the room, Amanda gave me a bib and gauze to catch the blood. A short time later, Dr. Jassin came back into the room and stuffed some packing in my right nostril to stop the bleeding. Dr. Jassin hurt me again when he stuffed the right side of my nose with packing to stop the bleeding caused by gouging my nose with the hard suction tool. It was my clear impression that Dr. Jassin intentionally injured my nose by gouging it with the hard suction device.

Dr. Branch then saw Bennett the next day (October 21) and put him in the hospital to remove the gauze and packing from his nose. He observed the surgical

wound and noted that it appeared to have been reopened and was swollen and red. Dr. Branch's report states that Bennett describes pain on the right side of his face and eye that has lasted for eighteen months since his follow-up visit with Dr. Jassin.

**Adequacy of Report**

We begin with Dr. Jassin's second and third sub-issues, which contend that the trial court abused its discretion in finding that a qualified report set forth a clear standard of care and breach of that standard of care in such a manner to cause harm to Bennett and that the trial court abused its discretion in finding that Dr. Branch's reports adequately provided the causal relationship between his alleged failure to meet the applicable standard of care and the injury, harm, or damages claimed. We review the trial court's decision on a motion to dismiss a health-care liability claim for an abuse of discretion. *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 877 (Tex. 2001).

When considering a motion to dismiss under subsection 74.351(b), the issue for the trial court is whether the report represents a good-faith effort to comply with the statutory definition of an expert report. *See id.* An "expert report" is "a written report by an expert that provides a fair summary of the expert's opinions as of the date of the report regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed." TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(r)(6).

In determining whether the report represents a good-faith effort, the inquiry is

limited to the four corners of the report. *Palacios*, 46 S.W.3d at 878. The report need only represent a good-faith effort to provide a fair summary of the expert's opinions. *Id.* The report does not have to marshal all of the plaintiff's proof and the plaintiff need not present evidence in the report as if it were actually litigating the merits. *Id.* at 879. Rather, to constitute a good-faith effort, the report must address the standard of care, breach, and causation with sufficient specificity to inform the defendant of the conduct the plaintiff calls into question and to provide a basis for the trial court to conclude that the claims have merit. *Id.* at 875. A report, however, cannot merely state the expert's conclusions as to the standard of care, breach, and causation. *See id.* at 879. The expert must explain the basis for his statements and must link his conclusions to the facts. *Bowie Mem. Hosp. v. Wright*, 79 S.W.3d 48, 52 (Tex. 2002).

Dr. Branch's report states:

**Standard of Care:**

The sinus surgery performed on Tom Bennett at Ennis Regional Hospital on October 16, 2008 by Dr. Jassin appears to have gone well. The follow up visit four days later on October 20, 2008 appeared to have gone well until Dr. Jassin became angry that the patient, Tom Bennett, had stopped taking the pain medication due to an allergic reaction. The standard of medical care following sinus surgery performed on Tom Bennett would be to carefully and gently vacuum the nose after using topical anesthesia to prevent pain following the sinus surgery. Dr. Jassin deviated from the standard of reasonable medical care when, according to Tom Bennett, he gouged the lower part of the patient's nose with the hard suction device on the vacuum. When the patient screamed in pain[,] the "hard" vacuuming should have immediately stopped and topical anesthesia reapplied if further debridement necessary. Instead, according to Tom Bennett, Dr. Jassin continued to exert significant force on the inside of the right nostril of Tom Bennett with the hard plastic suctioning device until the inside of the patient's nose started bleeding profusely. The conduct described by Tom Bennett in his statement indicates a failure

to follow the standard of reasonable medical care under the circumstances and, based on a reasonable medical probability, is the cause of the injuries described under the causation section of this report.

**Causation:**

Tom Bennett describes a pain on the right side of his face and eye which has lasted for approximately 18 months from the date of the follow up visit with Dr. Jassin on October 20, 2008. It is my opinion that the manner in which Dr. Jassin applied the hard plastic suctioning device to the inside of the right nostril of Tom Bennett reopened the wound and caused damage to the sensory nerves in his sinus area, causing pain behind the patient's right eye. Based on a reasonable medical probability[,] the damage to the sensory nerves may be a permanent condition. Tom Bennett relates that he still feels intense pain in his teeth, jaw and right eye, all of which began following the sinus surgery and follow up visit with Dr. Jassin on October 20, 2008. There is a temporal consistency between the onset of the facial pain following the sinus surgery and the follow up visit with Dr. Jassin.

I saw Tom Bennett professionally on October 21, 2008 and I put Mr. Bennett in the hospital on October 22, 2008 to remove the gauze and packing from his nose. In treating Mr. Bennett on October 21 and 22, 2008 I was able to observe the wound and noted that the area of the wound appeared to have been reopened and the area around the wound was swollen and red.

In reviewing the records of the neurologist, Stephen Herzog, M.D., I noted his comments concerning TMJ. In my opinion, based on examination of Tom Bennett in October 2008, he was not suffering from TMJ and TMJ was not the cause of his facial pain and injury to his sensory nerves.

The report plainly sets forth the standard of care applicable to Dr. Jassin, how he breached it, and how the breach caused Bennett's injuries. Dr. Branch's report addresses how Dr. Jassin's conduct has been called into question, as well as the causal relationship between Dr. Jassin's alleged negligence and Bennett's injuries. It is sufficiently specific; it is not conclusory. The report provided a sufficient basis for the

trial court to conclude that Bennett's claim against Dr. Jassin has merit. We conclude that Dr. Branch's report represents an objective good-faith effort to comply with the definition of an expert report.[1]  *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(r)(6). Therefore, we conclude that the trial court did not abuse its discretion in denying Dr. Jassin's motion to dismiss. We overrule Dr. Jassin's second and third sub-issues.

**Expert Qualification on Causation**

In his first sub-issue, Dr. Jassin contends that the trial court abused its discretion in finding that Dr. Branch was qualified to tender an expert report on causation. Specifically, Dr. Jassin asserts, "The documents offered by Dr. Branch cannot be expert reports under the statute because he is not shown to be qualified to opine regarding any causal link between Dr. Jassin's care at issue and the asserted damages."[2]

A trial court's decision on whether a person is qualified to offer an expert opinion in a health-care liability claim is reviewed under the abuse-of-discretion standard. *Moore v. Gatica,* 269 S.W.3d 134, 139 (Tex. App.—Fort Worth 2008, pet. denied); *see also Larson v. Downing,* 197 S.W.3d 303, 304-05 (Tex. 2006). "[W]e defer to the trial court on close calls concerning an expert's qualifications." *Hillcrest Baptist Med. Ctr. v. Payne,* No. 10-11-00191-CV, 2011 WL 5830469, at *5 (Tex. App.—Waco Nov. 16, 2011, pet. denied) (mem. op.) (citing *Larson,* 197 S.W.3d at 304-05, and *Broders v. Heise,*

---

[1] We agree with Dr. Jassin that Dr. Branch's supplemental report's reference to Dr. Jassin's excessive use of Surgicel is merely observational; it attempts in no way to assert a standard of care and breach.

[2] We reject Bennett's assertion that Dr. Jassin failed to raise in the trial court his complaint that Dr. Branch is not qualified to give an expert report on causation. Dr. Jassin adequately raised the issue in his objections and in his motion to dismiss. *See Baylor Univ. Med. Ctr. v. Rosa,* 240 S.W.3d 565, 569 (Tex. App.—Dallas 2007, pet. denied).

924 S.W.2d 148, 151 (Tex. 1996) ("The qualification of a witness as an expert is within the trial court's discretion. We do not disturb the trial court's discretion absent clear abuse.")).

To be qualified to provide opinion testimony regarding the causal relationship between the alleged departure from accepted standards of care in a health care liability claim and the injury, harm, or damages claimed, the expert must be a physician who is otherwise qualified to render opinions on such causal relationship under the Texas Rules of Evidence. TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(r)(5)(C). Rule of Evidence 702 provides: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise." TEX. R. EVID. 702.

Dr. Branch's report and CV reflect that he is a practicing otolaryngologist. His report states:

> During the course of my professional practice[,] I have performed approximately 200 sinus surgeries such as the surgery performed by Dr. Jassin on Thomas Bennett on October 16, 2008. On each such occasion where surgery was performed, I also conducted the follow up examination of the patient.

Additionally, in his causation opinion, Dr. Branch reported on his own examination and treatment of Bennett, stating that he "was able to observe the wound and noted that the area of the wound appeared to have been reopened and the area around the wound was swollen and red." Dr. Branch concluded:

> It is my opinion that the manner in which Dr. Jassin applied the

hard plastic suctioning device to the inside of the right nostril of Tom Bennett reopened the wound and caused damage to the sensory nerves in his sinus area, causing pain behind the patient's right eye. Based on a reasonable medical probability[,] the damage to the sensory nerves may be a permanent condition. Tom Bennett relates that he still feels intense pain in his teeth, jaw and right eye, all of which began following the sinus surgery and follow up visit with Dr. Jassin on October 20, 2008. There is a temporal consistency between the onset of the facial pain following the sinus surgery and the follow up visit with Dr. Jassin.

We cannot say that the trial court abused its discretion in implicitly finding that Dr. Branch is qualified to provide an expert report on causation for the complications that allegedly arose from Dr. Jassin's post-operative care following a sinus surgery that Dr. Branch says he has performed approximately 200 times, along with providing the follow-up care for those surgeries. *See Sloman-Moll v. Chavez*, No. 04-06-00589-CV, 2007 WL 595134, at *4 (Tex. App.—San Antonio Feb. 28, 2007, pet. denied) (mem. op.) (holding that otolaryngologist's expertise concerning standard of care for endoscopic sinus surgery "also qualifies him to opine on the cause in fact of postoperative complications that flow from that surgery"). "It is axiomatic that a physician trained to perform surgery is also trained to manage surgical complications." *Id.* (citing *Keo v. Vu*, 76 S.W.3d 725, 733 (Tex. App.—Houston [1st Dist.] 2002, pet. denied)); *see also Livingston v. Montgomery*, 279 S.W.3d 868, 873-77 (Tex. App.—Dallas 2009, no pet.).[3] And in that vein, it would also be reasonable for the trial court to have considered Dr. Branch's own

---

[3] Dr. Jassin also contends that Dr. Branch is not qualified to rule out the vaguely referenced possible diagnosis by a neurologist of a TMJ disorder as the cause of Bennett's problems. Dr. Jassin asserts that Dr. Branch's report and CV do not reflect any expertise in neurology or TMJ disorders. But in an expert report on causation, an expert is not required to rule out every possible cause of the injury, harm, or damages claimed. *See Payne*, 2011 WL 5830469, at *5 (citing *Baylor Med. Ctr. v. Wallace*, 278 S.W.3d 552, 562 (Tex. App.—Dallas 2009, no pet.)). Therefore, whether Dr. Branch is qualified to rule out a TMJ disorder is not at issue in this appeal.

post-operative examination and treatment of Bennett in concluding that Dr. Branch is qualified on causation.

Furthermore, because Dr. Jassin did not dispute that Dr. Branch is a qualified expert on the standard of care applicable to Dr. Jassin's treatment of Bennett for purposes of Chapter 74, it would be reasonable for the trial court to have concluded that, for purposes of his expert report under Chapter 74, Dr. Branch is qualified on the causal relationship between the post-operative procedure and the alleged complication arising from it. *See Payne,* 2011 WL 5830469, at *7 (citing *Whisenant v. Arnett*, 339 S.W.3d 920, 927 (Tex. App.—Dallas 2011, no pet.)).

We overrule Dr. Jassin's first sub-issue and affirm the trial court's order.


REX D. DAVIS
Justice

Before Chief Justice Gray,
     Justice Davis, and
     Justice Scoggins
Affirmed
Opinion delivered and filed November 29, 2012
[CV06]